**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

BLANCA *et al.*,

*Plaintiffs*,

v.

DONALD J. TRUMP *et al.*,

*Defendants*.

Case No. 1:26-cv-4295

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS


INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 3

I. The 2025 Executive Order. ........................................................................................ 3

II. The 2026 Executive Order. ........................................................................................ 5

III. The 2026 Executive Order's Implementing Guidance. ........................................................ 7

IV. The 2026 Executive Order's Harms to the Proposed Class Representatives.................... 10

LEGAL STANDARD................................................................................................... 13

ARGUMENT ........................................................................................................... 13

I. Plaintiffs Are Likely to Succeed on the Merits............................................................. 13

A. Plaintiffs Have Standing to Challenge the 2026 Executive Order. ................................ 14

B. The 2026 Executive Order Violates the Citizenship Clause and 8 U.S.C. § 1401. ....... 18

II. The Remaining Injunction Factors Decisively Favor Immediate Relief. ......................... 26

A. The Executive Order Threatens Irreparable Harm. ...................................................... 26

B. Enjoining the Executive Order Would Serve the Public Interest. ................................. 27

CONCLUSION ......................................................................................................... 28

## INTRODUCTION

The Supreme Court has "repeatedly understood" the Citizenship Clause of the Fourteenth Amendment "to guarantee citizenship to all children born in the United States and subject to its power." *Trump v. Barbara*, 146 S. Ct. 2438, 2453 (2026). In *United States v. Wong Kim Ark*, 169 U.S. 649 (1898), the Supreme Court held "that the Fourteenth Amendment was merely 'declaratory' of the 'fundamental rule of citizenship by birth' that prevailed at common law." *Barbara*, 146 S. Ct. at 2452 (quoting *Wong Kim Ark*, 169 U.S. at 688). The Amendment only "excluded those recognized as exempt 'from the jurisdiction of this country'—the 'children of ambassadors' and other representatives of foreign sovereigns, as well as those born in the 'alien nations' of Indian tribes." *Id.* (quoting *Wong Kim Ark*, 169 U.S. at 675). "All others were citizens at birth, whether born to permanent residents or temporary visitors." *Id.*

On the first day of his second Term, President Trump sought to test the validity of that "seminal" precedent. *Id.* at 2450-51. He issued an Executive Order aimed at "upend[ing] our country's longstanding tradition of birthright citizenship and eliminat[ing], for large swaths of Americans, the right to citizenship by birth." *CASA, Inc. v. Trump* (*CASA IV*), 838 F. Supp. 3d 498, 504 (D. Md. 2026). The Supreme Court rejected that effort. Reaffirming *Wong Kim Ark* and the common law history on which it was based, the Supreme Court held that "children born of parents unlawfully or temporarily present in the United States" are "citizens at birth" because they "satisfy both elements of the Citizenship Clause: they are 'born ... in the United States' and 'subject to the jurisdiction thereof.'" *Barbara*, 146 S. Ct. at 2450. That ruling "effectively invalidated the [President's] Executive Order as unconstitutional and dispelled any doubts about the meaning and scope of the Citizenship Clause of the Fourteenth Amendment." *CASA IV*, 838 F. Supp. 3d at 504.

"Or so it seemed." *Id.* Just a few weeks after the decision in *Barbara*, President Trump issued a new Executive Order "continu[ing] his efforts to abolish birthright citizenship for many Americans." *Id.* The Order purports to deny citizenship to those born in the United States to immigrant parents within several categories. *See* Executive Order 14418, "Continuing to Protect the Meaning and Value of American Citizenship," 91 Fed. Reg. 51991 (Aug. 6, 2026) ("2026 Executive Order"). "Even a cursory review of the 2026 Executive Order's carveouts to birthright citizenship reveals they bear little to no resemblance to the 'narrow exceptions' to the rule of citizenship by birth recognized by the Supreme Court." *CASA IV*, 838 F. Supp. 3d at 504. These are categories of the President's own invention, inconsistent with the Fourteenth Amendment's "broad reach and narrow exceptions," *Barbara*, 146 S. Ct. at 2450, and untethered from the plain meaning of the Citizenship Clause's text.

Where the Constitution carves out only those born to "enemies within and during a hostile occupation of part of our territory," *Wong Kim Ark*, 169 U.S. at 693, the Order purports to deny citizenship if either of a person's parents is labeled an "alien enemy," without the predicate of a hostile occupation, 2026 Executive Order § 2(a). Where the Constitution exempts only the children of diplomats "entitled by the law of nations to the privileges and immunities of ambassadors or public ministers," *Wong Kim Ark*, 169 U.S. at 678-79, the Order purports to deny citizenship to anyone born to the far broader class of "foreign government employee[s]," 2026 Executive Order § 2(b). And where the Constitution extends citizenship on equal terms to those "born to permanent residents or temporary visitors," *Barbara*, 146 S. Ct. at 2452, the Order denies citizenship to any person "when the parent(s) of the person engage in a commercial transaction to ensure that the person's mother is present in the United States, or a territory of the United States, to give birth," or "when the parent(s) engage in a commercial transaction with a surrogate present in the United

States, or a territory of the United States, to give birth," 2026 Executive Order § 2(c). None of those categories has any historical or constitutional basis. They all cover individuals who are subject to the jurisdiction of the United States and thus entitled to citizenship under the Fourteenth Amendment.

Plaintiffs Blanca, Ana, Oriana, Robert, Judy, and John bring this class-action lawsuit to enjoin the President's latest effort to break the "promise" of birthright citizenship. *Barbara*, 146 S. Ct. at 2458. They are noncitizens whose children were or will be born in the United States and who face a credible threat of being denied or stripped of U.S. citizenship under the 2026 Executive Order. For those children, and for thousands similarly situated individuals, the Order's harms are grave, personal, and imminent. To redress and prevent those serious injuries, Plaintiffs move—on behalf of their children and a proposed class of all people similarly threatened—for a classwide preliminary injunction barring enforcement of the challenged provisions of the Executive Order.[1]

## BACKGROUND[2]

### I. The 2025 Executive Order.

On the first day of his second term in office, President Trump issued an Executive Order titled "Protecting the Meaning and Value of American Citizenship." *See* Exec. Order No. 14160, 90 Fed. Reg. 8449 (Jan. 20, 2025) ("2025 Executive Order"). The 2025 Executive Order "provides that children born of persons unlawfully or temporarily present in the United States are not 'subject to the jurisdiction' of the United States—and thus do not qualify for citizenship under the Fourteenth Amendment or the Immigration and Nationality Act." *Barbara*, 146 S. Ct. at 2444. The

[1] For purposes of this motion, Plaintiffs move for preliminary relief based on Counts I, II, and III of their Complaint, which allege that the 2026 Executive Order violates the Fourteenth Amendment and 8 U.S.C. § 1401 *et seq.*

[2] For the Court's convenience, the Background section of this brief and of Plaintiffs' brief in support of their motion for class certification are identical.

Order directed that, starting with children born 30 days from the date on which the Order was issued, "no department or agency of the United States government shall issue documents recognizing United States citizenship, or accept documents issued by State, local, or other governments or authorities purporting to recognize United States citizenship" to persons denied citizenship under the Executive Order. 2025 Executive Order § 2.

This Court held that the 2025 Executive Order was likely unconstitutional and issued a classwide injunction barring its enforcement. *See CASA, Inc. v. Trump* (*CASA I*), 763 F. Supp. 3d 723 (D. Md. 2025); *CASA, Inc. v. Trump* (*CASA II*), 793 F. Supp. 3d 703 (D. Md. 2025); *CASA, Inc. v. Trump* (*CASA III*), 793 F. Supp. 3d 687 (D. Md. 2025). The Supreme Court ultimately granted certiorari before judgment in another nationwide class action challenging the 2025 Executive Order and held that all children covered by the Order are entitled to citizenship under the Fourteenth Amendment, affirming a classwide preliminary injunction barring the Order's enforcement. *See Barbara*, 146 S. Ct. at 2450.

The Supreme Court's decision in *Barbara* reaffirmed that birthright citizenship has a "broad reach and narrow exceptions," limited to the closed set of four historically rooted common-law exceptions recognized in *Wong Kim Ark*. *Id.*; *see also id.* at 2471 (Kavanaugh, J., concurring in the judgment and dissenting in part) (describing "the Court today" as holding that those "four exceptions [are] a closed set"). The Court held that "children born of parents unlawfully or temporarily present in the United States" are "citizens at birth" because "[t]hey satisfy both elements of the Citizenship Clause: they are 'born ... in the United States' and 'subject to the jurisdiction thereof.'" *Id.* at 2450.

## II. The 2026 Executive Order.

Following the Supreme Court's ruling in *Barbara*, the President issued a new Executive Order again claiming to limit birthright citizenship, which he framed as a continuation of the 2025 Executive Order. *See* Exec. Order No. 14418, "Continuing To Protect the Meaning and Value of American Citizenship," 91 Fed. Reg. 51991 (Aug. 6, 2026) ("2026 Executive Order"). Like its predecessor, the 2026 Executive Order purports to deny citizenship to several categories of people born in the United States to noncitizen parents.

First, the Order denies citizenship to a person if one of their parents is an "alien enemy," defined to include, nonexhaustively, "any member of a designated Foreign Terrorist Organization under 8 U.S.C. [§] 1189 or Specially Designated Global Terrorist, consistent with the International Emergency Economic Powers Act, 50 U.S.C. [§] 1701 *et seq.*, and Executive Order 13224 of September 23, 2001 (Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), as amended." 2026 Executive Order § 2(a).

Second, the Order denies citizenship to a person if one of their parents is a "foreign government employee." *Id.* § 2(b). This category stretches beyond ambassadors, whose children are already exempt from birthright citizenship under the Fourteenth Amendment, to include "persons employed by a foreign embassy or consulate who are nationals of that foreign country," "persons employed by a foreign government in an official capacity," and "persons employed by an international organization that possess international-organization immunity." *Id.*[3]

Third, the Order denies citizenship to a person if "either parent of that person engaged in a commercial transaction to purchase or access birthright citizenship for the person, or engaged in

[3] The proposed class does not include the children of ambassadors, and Plaintiffs do not challenge Section 2(b)(1) of the 2026 Executive Order, which simply restates the existing exclusion from birthright citizenship for the children of ambassadors. *See Barbara*, 146 S. Ct. at 2450.

fraudulent activity to obtain citizenship." *Id.* § 2(c). This third category "include[s]," but is not limited to, situations "when the parent(s) of the person engage in a commercial transaction to ensure that the person's mother is present in the United States, or a territory of the United States, to give birth" or "when the parent(s) engage in a commercial transaction with a surrogate present in the United States, or a territory of the United States, to give birth." *Id.*

Fourth, the Order denies citizenship to a person who "is born in a territory or territorial waters of the United States where citizenship is not conferred by Federal statute." *Id.* § 2(d).[4]

The 2026 Executive Order instructs that "[t]he Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security shall take all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order, and that no officers, employees, or agents of their respective departments and agencies act, or forbear from acting, in any manner inconsistent with this order." *Id.* § 3(a). That provision includes no effective date. Separately, the Order directs that "[t]he heads of all executive departments and agencies shall issue public guidance within 30 days of the date of this order regarding this order's implementation with respect to their operations and activities." *Id.* § 3(b). Unlike the 2025 Executive Order, which specified that it applied "only to persons who are born within the United States after 30 days from the date of this order," the 2026 Order does not specify that it applies only to people born after any particular date.

The *CASA* plaintiffs filed a supplemental complaint alleging that the 2026 Executive Order violates the Fourteenth Amendment and federal law as applied to the certified class in that case and sought a preliminary injunction barring its enforcement against members of that class. *CASA, Inc. v. Trump* (*CASA IV*), 838 F. Supp. 3d 498, 508-10 (D. Md. 2026). The District Court granted

[4] Plaintiffs' class definition does not include people born in United States territories, and Plaintiffs do not challenge Section 2(d) of the Executive Order.

a preliminary injunction, concluding that "[t]he 2026 Executive Order is almost certainly unconstitutional as applied to the certified class for the simple reason that the Supreme Court in *Barbara* already decided that the children in the class are citizens at birth." *Id.* at 504. The District Court determined that "[t]he common law exceptions identified in *Wong Kim Ark* were and remain the only Supreme Court-recognized exceptions to the rule of citizenship by birth," *id.* at 519; that the *CASA* plaintiffs would be "irreparably harmed by an Executive Order that purports to deny them citizenship," *id.* at 520; and that the 2026 Executive Order threatened "confusion and upheaval" if allowed to go into effect, *id.* at 521 (citation omitted). That threat of confusion is exacerbated, the District Court found, because the 2026 Executive Order, "by its plain language, … applies to all children who meet its criteria—regardless of when they were born." *Id.* at 514.

Because the *CASA* plaintiffs challenged the 2026 Executive Order only as applied to the existing class in that case, the Court declined to address whether the Order would be constitutional as applied to people outside that class. *Id.* at 519.

## III. The 2026 Executive Order's Implementing Guidance.

Two days after the Court in *CASA* issued classwide preliminary relief, the State Department, the Social Security Administration ("SSA"), the Department of Agriculture, the Centers for Medicare & Medicaid Services ("CMS"), the Administration for Children & Families ("ACF"), and the Department for Housing & Urban Development ("HUD") released guidance implementing the 2026 Executive Order. U.S. Citizenship & Immigration Services ("USCIS") issued an interim final rule, without notice and comment, to "govern[] the registration of permanent resident status for children born to foreign government employees who previously would have been considered United States citizens at birth." Registration of Lawful Permanent Residence for Children Born to Foreign Government Employees in the United States, 91 Fed. Reg. 57,249, 57,252 (Sept. 9, 2026) ("the USCIS IFR").

Although the USCIS IFR "applies prospectively to children born in the United States on or after the effective date of the IFR," *id.* at 57,251, the other guidance documents do not state that they are applicable only to children born after any specific date. Instead, they parrot the following phrase: "Because the EO is prospective only, this guidance is prospective only and will become effective upon publication subject to any legal obligations." *E.g.*, ECF 1-1 at 2 (State Department guidance); ECF 1-2 at 2 (SSA guidance). But these documents fail to explain what they mean by "prospective," and many, by their terms, apply to all applicants for relevant government documents or benefits regardless of when they were born.

The guidance issued by the State Department to control the issuance of passports, for instance, create new procedures for *all* passport applicants, regardless of when they were born, despite including the boilerplate language about being prospective. It states flatly that "[p]assport agency staff will utilize the existing parental data fields on form DS-11, submitted documents, relevant government records, and other indicators to assess whether an applicant is within the categories of children of aliens who fall within the scope of EO 14418." ECF 1-1 at 4. "If neither parent of a minor applicant is a U.S. citizen, an attestation from each parent, under penalty of perjury, must be submitted as part of the determination whether either parent meets any of the EO conditions." *Id.* The staff assessment and the attestation requirement for parents of minors who apply for passports are not limited to children born after any particular date.

The guidance issued by SSA to control the issuance of Social Security Numbers similarly applies regardless of when a person is born. It states that, going forward, "a birth certificate showing a U.S. place of birth will not be sufficient documentary evidence of United States citizenship for persons covered by the EO." ECF 1-2 at 2. That change is not limited to children born after any specific date. The guidance later adds that, "[a]fter we have issued a child's SSN, if

we receive agency data … that indicates a parent met one of the EO conditions at the time of the child's birth and an SSN should not have been issued, we will notify the parent and update our records accordingly." *Id.* at 4. That review is also not limited to children born after any specific date.

The guidance documents issued by the Department of Agriculture, CMS, ACF, and HUD all concern what proof of citizenship is necessary to confirm eligibility for certain benefits. Although these documents generally follow a similar format, there are important differences between them. Most significantly, they differ on whether a person born in the United States before issuance of the 2026 Executive Order may prove citizenship with a birth certificate. Under both the CMS and HUD guidance documents, a birth certificate is no longer sufficient to prove citizenship without additional information about the applicant's parents, no matter when the birth certificate was issued. *See* ECF 1-3 at 4 (CMS); 1-4 at 3 (HUD).

The guidance documents also fail to provide clarity about who falls within the 2026 Executive Order's broad, vague categories. None of the guidance documents attempts to further define either the alien-enemy category or the commercial-transaction category. The State Department's new passport policy, for instance, says only that the Department will assess whether "either parent of that person is an alien enemy … based on relevant government records and other indicators in identifying such individuals," without specifying which records or indicators would be relevant. ECF 1-1 at 2. The passport policy similarly provides that the Department will assess whether "either parent of that person engaged in a commercial transaction to purchase or access birthright citizenship for the person … based on relevant government records and other indicators identifying such activities," without specifying which records or indicators would be relevant. *Id.*

As for the government-employee category, the passport policy states that this category "generally does not include (subject to individualized assessments of employment status, purpose of travel, and visa class)," the "[p]ersonal employees of foreign government or international organization officials;" "[e]mployees of state-owned enterprises;" "[t]hird-country nationals working for a foreign government, including at a foreign embassy or consulate;" "[e]mployees of international organizations beyond those international organizations designated by executive order as enjoying immunity in the United States under the International Organizations Immunities Act;" "[c]ontractors of foreign missions, international organizations, or governments;" and "[f]oreign government employees visiting the United States in a personal rather than an official capacity." *Id.* at 3. But the policy nowhere explains what makes those people differently situated for purposes of U.S. jurisdiction than the foreign government employees to whom the Order applies.

## IV. The 2026 Executive Order's Harms to the Proposed Class Representatives.

The named Plaintiffs are parents who seek to pursue this case on behalf of their current or future U.S.-born children and all other similarly situated people who are entitled to citizenship under the Fourteenth Amendment and 8 U.S.C. § 1401, but who would be denied citizenship under the terms of the 2026 Executive Order. Plaintiffs are willing to represent the interests of their children and serve as class representatives on behalf of all others similarly situated.

Plaintiff and Proposed Class Representative **Blanca** brings this suit on behalf of her future child and all similarly situated individuals. Blanca is a member of CASA, Inc., a native of El Salvador, and a resident of Maryland with a pending asylum application. *See* Blanca Decl. ¶ 2. She is expecting a child due in March 2027 with her partner, a noncitizen from Venezuela. *Id.* ¶ 3. In El Salvador, Blanca was wrongfully arrested and accused of membership in a faction of Barrio 18, a designated Foreign Terrorist Organization ("FTO"). *Id.* ¶ 7. Despite her release and the dismissal of charges, public records and photographs continue to associate her with the group. *Id.* She now

fears, in light of that experience and her partner's Venezuelan nationality, that her child will be denied U.S. citizenship under the 2026 Executive Order and left without a homeland. *Id.* ¶¶ 8-9.

Plaintiff and Proposed Class Representative **Ana** brings this suit on behalf of her children and all similarly situated individuals. Ana is a member of the Asylum Seeker Advocacy Project, a native of Venezuela, and a resident of Florida. *See* Ana Decl. ¶ 2. She and her husband—also a noncitizen from Venezuela—came to the United States in 2017. *Id.* ¶ 3. Ana and her husband traveled to the United States on valid tourist visas by commercial plane. *See* Ana Decl. ¶ 3. Ana later applied for asylum, and her application is pending. *Id.* ¶ 4. While Ana and her husband were originally told that a medical condition would make it challenging for her to conceive, they were happily surprised when they were able to have two children in the United States, born in 2018 and 2025. *Id.* ¶¶ 5-6. But Ana now fears that her children's citizenship is at risk, both because the Administration has repeatedly attempted to deport Venezuelans as alien enemies and because she worries the Administration will accuse her and her husband of deliberately traveling to the United States to have their children. *Id.* ¶¶ 13-14. Although Ana's children currently have U.S. passports, they will have to apply to renew them soon, at which point Ana fears they could lose them under the State Department's guidance implementing the 2026 Executive Order. *Id.* ¶ 15.

Plaintiff and Proposed Class Representative **Oriana** brings this suit on behalf of her future child and all similarly situated individuals. Oriana is a member of the Asylum Seeker Advocacy Project, a native of Venezuela, and a resident of Florida. *See* Oriana Decl. ¶ 2-3. She and her partner—also a noncitizen from Venezuela—came to the United States in 2017 on valid tourist visas by commercial plane. *Id.* ¶ 4. Oriana later applied for asylum, and her application is pending. *Id.* ¶ 5. Oriana is expecting her first child, and she is due to give birth in early 2027. *Id.* ¶ 7. Oriana

now fears that her child will be denied citizenship based on her and her partner's Venezuelan nationality and their commercial travel to the United States. *Id.* ¶ 12–13.

Plaintiff and Proposed Class Representative **Robert** brings this suit on behalf of his child and all similarly situated individuals. Robert and his wife are French citizens and residents of Washington, D.C. Robert Decl. ¶¶ 2-3. Robert's wife works at an international organization with international-organization immunity, but she is not protected by diplomatic or consular immunity. *Id.* ¶ 3. His wife has a G-4 visa, and he has a G-4 spousal visa. *Id.* ¶ 4. Robert's child was born in June 2026 in the United States. *Id.* ¶ 5. Although Robert's child has a U.S. passport, he worries that it may not be renewed or that his child will be denied U.S. citizenship because his wife is considered a "foreign government employee" under the 2026 Executive Order. *Id.* ¶¶ 7-8, 10.

Plaintiff and Proposed Class Representative **Judy** brings this suit on behalf of her child and all similarly situated individuals. Judy is a native of India and a lawful permanent resident who now lives in California with her husband, who is also a lawful permanent resident from India. *See* Judy Decl. ¶¶ 2-5. In 2022, Judy's child was born through a surrogate in Oregon. *Id.* ¶ 6. Judy and her husband did not use a U.S.-based surrogate to purchase citizenship—they had already been lawfully present in the United States for years—but they now fear that their child's citizenship is in jeopardy under the provision of the Executive Order concerning surrogacy. *Id.* ¶ 12. Judy's child has a United States passport. *Id.* She worries that, when she applies to renew her child's passport, the application will be rejected if she attests that she is covered by the 2026 Executive Order, but that she will be accused of defrauding the government if she answers that she is not covered. *Id.*

Plaintiff and Proposed Class Representative **John** brings this suit on behalf of his future child and all similarly situated individuals. John is a French citizen who lives in Paris with his French partner. *See* John Decl. ¶ 2. John and his partner are expecting a child via a U.S-based

surrogate in early 2027. *Id.* ¶ 3. They chose a U.S. surrogate because U.S. law provides a stable, ethical framework for surrogacy, not to purchase citizenship for their child. *Id.* ¶ 8. But John and his partner hope their child will form a meaningful connection to the country of the child's birth: they plan to have a continuing relationship with their surrogate and to teach their child English, and they have chosen a name that is common in both countries. *Id.* ¶ 10. John fears that his child will be denied the opportunity to maintain a connection to the United States. *Id.* ¶ 11. John is also concerned that the 2026 Executive Order will throw his plans for bringing the child home into disarray. *Id.* ¶ 12. If their child is denied citizenship, John and his partner worry that it will be difficult to obtain travel documentation for their child to leave the United States, leaving the family in limbo. *Id.* ¶ 12.

**LEGAL STANDARD**

"To obtain a preliminary injunction, a plaintiff 'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Am. Fed'n of State, Cnty. & Mun. Emps. v. SSA* (*AFSCME*), 172 F.4th 361, 366 (4th Cir. 2026) (en banc) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

**ARGUMENT**

**I. Plaintiffs Are Likely to Succeed on the Merits.**

Plaintiffs are likely to succeed on the merits because "[t]he 2026 Executive Order is almost certainly unconstitutional." *CASA IV*, 838 F. Supp. 3d at 504. *Barbara* held that the Citizenship Clause "settle[d] the issue" of citizenship "once and for all," leaving no room for the President to chip away at the Constitution's clear promise. *Barbara*, 146 S. Ct. at 2449. Because the class representatives' children, and all people within the proposed class, face a credible threat of being denied their constitutionally guaranteed citizenship under the Executive Order, Plaintiffs are

entitled to immediate classwide relief.

**A. Plaintiffs Have Standing to Challenge the 2026 Executive Order.**

To start, Plaintiffs have standing to challenge the 2026 Executive Order and its implementing guidance. Under the Fourth Circuit's precedent, "if a class representative has standing to seek equitable relief, the case is justiciable and the proponent of the class suit need not demonstrate that each class member has standing." *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 779 (4th Cir. 2023) (cleaned up); *see also CASA II*, 793 F. Supp. 3d at 730 ("[T]here is no … separate class action standing requirement"). As a result, the Court "need only determine whether a single Named Plaintiff in this case" is likely to "suffer[] a legal injury in fact" as a result of the 2026 Executive Order in order to issue preliminary injunctive relief. *Jonathan R. ex rel. Dixon v. Morrisey*, 178 F.4th 139, 162 (4th Cir. 2026).

Here, "at least one class representative … has Article III standing to seek each form of equitable relief requested." *Carolina Youth Action Project*, 60 F.4th at 779. "To establish standing, a plaintiff must show: (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *AFSCME*, 172 F.4th at 367 (internal quotation marks omitted). Plaintiffs make the "clear showing" on those elements required "[a]t the preliminary injunction stage." *Id.* (internal quotation marks omitted). Plaintiffs face a "credible threat" that their children will be denied citizenship under the Executive Order, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014), because they arguably fall within its text and Defendants have not disavowed enforcement against them, *see Chiles v. Salazar*, 146 S. Ct. 1010, 1019 n.* (2026).

Proposed class representative Blanca, for instance, has standing to challenge the 2026 Executive Order because of the credible threat that her child could be denied citizenship under the

alien-enemy category. As her declaration describes, Blanca is a noncitizen currently expecting a child in the United States and is due in March 2027. Blanca Decl. ¶ 3. Blanca was arrested in her home country and falsely accused of membership in a designated Foreign Terrorist Organization, such that public records and images continue to associate her with the group. *Id.* ¶ 7; *see also* ECF 1-1 at 2 (noting that the State Department will weigh a nonexhaustive list of "relevant government records and other indicators" to apply the "alien enemy" category). Blanca therefore faces a substantial risk that her child will be denied citizenship under Section 2(a).

The risk is exacerbated by the fact that the father of Blanca's child is Venezuelan, Blanca Decl. ¶ 4, and Plaintiffs Oriana and Ana also face a credible threat of enforcement against their children on that basis, *see* Oriana Decl. ¶ 12; Ana Decl. ¶ 16. By the 2026 Executive Order's plain text—and according to Defendants' representations in related litigation—the "alien enemy" category merely "include[s]" designated foreign terrorists but is not limited to them. 2026 Executive Order § 2(a). Nowhere have Defendants explained how far the category actually reaches. There is nothing in the Order to stop Defendants from deeming all nationals of any "strategic adversary," as decided by the President, to be alien enemies whose children will lose or be denied citizenship. *Barbara*, 146 S. Ct. at 2545 (Alito J., dissenting).

Defendants have been profligate in labeling noncitizens "alien enemies" in other contexts. The Administration has deported noncitizens as alien enemies based on evidence that courts have described as "shoddy" and "contradictory." *Sanchez Puentes v. Garite*, 780 F. Supp. 3d 682, 699 (W.D. Tex. 2025). It has relied on generic tattoos to associate individuals with Foreign Terrorist Organizations. *See* Eric Levenson, *Tattoos, Flyers and Deleted Photos: The Limited Evidence the Trump Administration Is Using to Try to Deport Migrants*, CNN (Mar. 25, 2025), https://perma.cc/6F7P-S99K. It has casually imputed membership in an FTO to individuals simply

because they have family members in those organizations. *See, e.g.*, *Sanchez Puentes*, 780 F. Supp. 3d at 700-01 (government maintained that individual was an "admitted affiliate" of Tren de Aragua because her ex-husband, from whom she separated over a decade prior, was a member). And it has concededly identified and deported individuals as alien enemies erroneously. *See Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025) (describing "administrative error" that led to removal of Salvadoran man as part of Alien Enemies Act removals). In each respect, the Administration's stunningly broad view of who qualifies as an alien enemy establishes a more-than-credible threat that Blanca's child will be denied citizenship under the 2026 Executive Order. *See CASA IV*, 838 F. Supp. 3d at 515 (holding that the government's track record of "hastily and without credible evidence attempting to remove people from the United States because of purported affiliations with groups deemed alien enemies" supports credible threat of enforcement). The same is true for Ana's and Oriana's children.

Proposed class representative Robert has standing because he faces a credible threat that his child will be stripped of citizenship under the foreign government employee category of the 2026 Executive Order. That category applies to people whose parents are noncitizens if one parent is "employed by an international organization that possess[es] international-organization immunity." 2026 Executive Order § 2(b). Robert and his wife are noncitizens, and she is employed by an international organization that possesses international-organization immunity. Robert Decl. ¶ 3. By its plain text, the Executive Order thus purports to deny Robert's child the citizenship to which the child is legally entitled—a straightforward Article III injury.

Finally, proposed class representatives Ana, Oriana, Judy, and John also have standing because they face a credible threat that their children will be denied citizenship under the commercial-transaction category. All are noncitizens with noncitizen partners. John is expecting a

child due early next year via a surrogate in the United States, *see* John Decl. ¶ 3, while Judy has a child who was born by surrogacy in the United States in 2022, *see* Judy Decl. ¶ 6. Both fall within the commercial-transaction category of 2026 Executive Order because they "engage[d] in a commercial transaction with a surrogate present in the United States, or a territory of the United States, to give birth." 2026 Executive Order § 2(c)(ii). Ana and Oriana, for their part, arrived in the United States by purchasing a plane ticket, and they reasonably fear that they will be accused of arranging to be in the United States in order to have their children—a risk that looms especially large for Ana, whose first child was born the year after she arrived in the United States. *See* Ana Decl. ¶¶ 5-6. All four therefore have standing to challenge the prospect that their children will unlawfully be denied the benefits of U.S. citizenship on the basis of the commercial-transaction category.

The fact that some of the proposed class representatives have children who were born before issuance of the 2026 Executive Order does not defeat their standing. As the Court held in *CASA IV*, "by its plain language, the 2026 Executive Order applies to all children who meet its criteria—regardless of when they were born." 838 F. Supp. 3d at 514. The guidance documents implementing the Executive Order do not change that calculus. Although they claim to be "prospective," many of them create new requirements applicable to everyone regardless of when they were born. They thus appear to be prospective only in the usual sense that laws are prospective: they "govern future conduct and claims" but are not limited to people who have not yet been born at the time of enactment. *Ward v. Dixie Nat. Life Ins. Co.*, 595 F.3d 164, 172 (4th Cir. 2010); *see, e.g.*, *Landgraf v. USI Film Prods.*, 511 U.S. 244, 286 (1994) (applying "presumption against statutory retroactivity" to interpret statute as limited to cases arising after enactment, not people born after enactment). In any event, one Plaintiff with standing is sufficient

to support classwide relief, and several of the proposed class representatives—Blanca, Oriana, and John—are expecting children who will be born after the issuance of the 2026 Executive Order.

**B. The 2026 Executive Order Violates the Citizenship Clause and 8 U.S.C. § 1401.**

The challenged provisions of the 2026 Executive Order are plainly unlawful. The Fourteenth Amendment and the INA both guarantee American citizenship to all people born in the United States and subject to its jurisdiction. U.S. Const. amend. XIV, § 1; 8 U.S.C. § 1401(a).

The Citizenship Clause provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend XIV, § 1. As the Supreme Court held in *Wong Kim Ark* and reaffirmed in *Barbara*, the "ordinary legal meaning of the text" of the Citizenship Clause, combined with the common-law history on which it was based, confers citizenship on "nearly everyone" born in the United States. *Barbara*, 146 S. Ct. at 2449-50.

"The story of citizenship in the United States begins with the English common law." *Id.* at 2445. Under the English common law principle of *jus soli*, or right of the soil, children born in England were natural-born subjects of the King, based on the "reciprocal tie" between the sovereign, who owed the people a duty of protection, and the people, who owed the sovereign a duty of allegiance. *Id.* (quoting *Calvin's Case*, 77 Eng. Rep. 377, 382 (K. B. 1608)). "Because the sovereign's power (and thus his duty) was limited in various respects, so too was the scope of this rule." *Id.* The King "could not demand allegiance from—for he could not protect—those born in lands that he did not control." *Id.* "And the same held true for ambassadors (and their families), who were considered—by a fiction of extraterritoriality—to remain on foreign soil." *Id.* "In all other respects, however, the sovereign's power—and his claim to the people's allegiance—was complete." *Id.* Accordingly, "[a] foreign mother could enter the British Isles, give birth, and leave

with her child the very next day, and that child would remain a British subject" "[b]ecause the child owed an implied allegiance to the sovereign who protected him at his birth—no matter how 'momentary and uncertain' his presence in the King's realms." *Id.* at 2445-46 (quoting *Calvin's Case*, 77 Eng. Rep. at 382).

"This view crossed the Atlantic with the colonists—and was adopted with little fanfare after the Revolution, as 'subject[s]' of the sovereign became 'citizens' of the States." *Id.* at 2446. Indeed, "[i]n a Nation of immigrants," the common-law rule's "broad scope took on particular importance." *Id.* at 2446-47. As tens of thousands of immigrants arrived in the United States, "they could be assured that their children would be American citizens by birth alone." *Id.* at 2447. In the antebellum period, "nothing" was "better settled" *Id.* (alteration and internal quotation marks omitted).

The Supreme Court shamefully departed from the ancient principle of birthright citizenship in *Dred Scott*, concluding that African-Americans were ineligible to become citizens. *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 404-05 (1857). "The Court had overruled the common law, but the people—eventually—would overrule the Court." *Barbara*, 146 S. Ct. at 2448. Following the Civil War, Congress made it a priority to overturn *Dred Scott* and enshrine birthright citizenship in the Constitution, where neither political winds nor prejudices could erode its guarantee. As the Supreme Court recently put it in *Barbara*, "the Fourteenth Amendment was intended to repudiate *Dred Scott*" and "to put the 'great question of citizenship' 'beyond the legislative power' altogether, to settle the issue once and for all." *Id.* at 2449 (quoting Cong. Globe, 39th Cong., 1st Sess., at 2891, 2896 (Sen. Howard)). "The Citizenship Clause mirrored the common law's criteria for citizenship," and "[a] child born on American soil and subject to American law was made an American citizen." *Id.*

The text of the Citizenship Clause captures the common law's "broad reach and narrow exceptions." *Id.* at 2450. The Clause refers to *all* children born in the United States, with the sole condition that they be "subject to [U.S.] jurisdiction." *Id.* At the time the Fourteenth Amendment was ratified, the meaning of that phrase would have been understood much as it is today: to be subject to a sovereign's authority. Michael Ramsey, *Originalism and Birthright Citizenship*, 109 Geo. L. J. 405, 437–40 (2020); *see* Noah Webster, *An American Dictionary of the English Language* 732 (Chauncey A. Goodrich & Noah Porter eds., 1865) (defining jurisdiction as "[p]ower of governing or legislating," "the power or right of exercising authority," the "limit within which power may be exercised," or "extent of power or authority"). The Framers of the Amendment intended for the phrase to carry its ordinary meaning. *See Barbara*, 146 S. Ct. at 2450 ("The Citizenship Clause uses jurisdiction in its ordinary sense—referring to the power of the United States to govern those within its territory."). Following the Civil War, it was paramount "that citizenship should be placed on unquestionable ground—on ground so plain that the humblest man who should inherit its protections would comprehend the extent and significance of his title." 2 James Gillespie Blaine, Twenty Years of Congress 189 (1884).

Long before ratification of the Fourteenth Amendment, the Supreme Court had held that the "jurisdiction" of the United States was closely tied to its territorial bounds, and that nearly everyone within that territory, including merchants and temporary visitors, was "amenable to the jurisdiction of the country." *The Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch.) 116, 144 (1812) (Marshall, C.J.). There were only limited exceptions to that rule, such as for "foreign ministers," who entered a country's territory as representatives of their own sovereign and were thus immune from local authority. *Id.* at 138-39. The Framers of the Fourteenth Amendment would have understood "jurisdiction" to mean the same thing. *Barbara*, 146 S. Ct. at 2450.

The "seminal case of" *Wong Kim Ark* confirmed this. *Id.* The Supreme Court held that "the Fourteenth Amendment was merely 'declaratory' of the 'fundamental rule of citizenship by birth" that prevailed at common law.'" *Id.* at 2452 (quoting, *Wong Kim Ark*, 169 U.S. at 456). That rule's "contours were clear." *Id.* "It excluded those recognized as exempt 'from the jurisdiction of this country'—the 'children of ambassadors' and other representatives of foreign sovereigns, as well as those born in the 'alien nations' of Indian tribes." *Id.* (quoting *Wong Kim Ark*, 169 U.S. at 675, 681-83, 693). "All others were citizens at birth, whether born to permanent residents or temporary visitors." *Id.* "What the Court held in *Wong Kim Ark* was simple: the Citizenship Clause incorporated the common law and granted citizenship to nearly all children born in the United States." *Id.* at 2453. That understanding has prevailed ever since. *Id.*

Section 201 of the Nationality Act of 1940, codified at 8 U.S.C. § 1401(a), similarly provides that all those "born in the United States, and subject to the jurisdiction thereof," "shall be nationals and citizens of the United States at birth." When Congress enacted that provision, it was universally understood that the phrase "subject to the jurisdiction thereof" carved out only the narrow exceptions identified in *Wong Kim Ark* and otherwise conferred citizenship on all children born in the United States. Congress intended to codify that interpretation in the statute. A report that President Franklin D. Roosevelt sent to Congress urging passage of the Nationality Act noted that this provision "is in effect a statement of the common-law rule, which has been in effect in the United States from the beginning of its existence as a sovereign state." Staff of H. Comm. on Immigr. and Naturalization, *Nationality Laws of the United States: Message from the President of the United States*, 76th Cong. 418 (Comm. Print 1939). The report further explained that birthright citizenship under Section 1401(a) extends to "a child born in the United States of parents residing

therein temporarily" because "it is the fact of birth within the territory and jurisdiction, not the domicile of the parents, which determines the nationality of the child." *Id.*

The challenged provisions of the 2026 Executive Order violate the Citizenship Clause and the INA because they target children who do not fit within the closed set of common-law exceptions.

***Alien enemies.*** The Executive Order's new "alien enemy" carveout bears no relationship to the common-law exception for "children born of alien enemies *in hostile occupation*." *Wong Kim Ark*, 169 U.S. at 682 (emphasis added). It is the existence of a hostile occupation that creates the exception. At common law, children born in occupied territory were not "subject to the jurisdiction" of the sovereign because the King "could not demand allegiance from—for he could not protect—those born in lands that he did not control." *Barbara*, 146 S. Ct. at 2445. Such lands included "discrete areas within his kingdom that were temporarily outside his control," as when foreign armies seized "a castle or fort." *Id.* (internal citation and quotation marks omitted). Or as Justice Story explained it in the American context, when the British occupied Castine, Maine, during the War of 1812, "[t]he sovereignty of the United States over the territory was, of course, suspended, and the laws of the United States could no longer be rightfully enforced there, or be obligatory upon the inhabitants who remained and submitted to the conquerors." *United States v. Rice*, 17 U.S. 246, 254 (1819).

Fortunately, no part of the United States is currently under hostile occupation by a foreign force. There is no area where the United States' "sovereignty" has been "suspended" or "the laws of the United States c[an] no longer be rightfully enforced." *Id.* On the contrary, alleged members of designated terrorist organizations who are present in the United States remain subject to the Nation's "[p]ower of governing or legislating." *Barbara*, 146 S. Ct. at 2449 (quoting N. Webster,

An American Dictionary of the English Language 732 (C. Goodrich & N. Porter eds. 1865)). As a result, there is simply no one in the United States today covered by the historical exception for occupying armies. Anyone against whom the 2026 Executive Order's "alien enemy" category could be enforced is therefore "subject to the jurisdiction" of the United States, U.S. Const. amend. XIV, § 1, and their children born in the United States are entitled to citizenship.

The category suffers from the additional problem that it stretches the term "alien enemy" beyond its accepted meaning. At common law, "an alien enemy is the subject of a foreign state at war with the United States." *Johnson v. Eisentrager*, 339 U.S. 763, 769 n.2 (1950); *cf.* 50 U.S.C. § 21 (Alien Enemies Act requires "a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion … perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government"). But the Order appears to use the term differently, because few (if any) Foreign Terrorist Organizations would fit that bill—all the more so as the Administration continues to tack new entities onto the list. *See* U.S. Dep't of State, Designated Foreign Terrorist Organizations, https://perma.cc/QS5Z-Z9X5. And because only one parent need be labeled an alien enemy to trigger the Order's application, the category would stretch far enough to deny citizenship to, for instance, a child born in the United States to a mother who fled a violent partner associated with a cartel that has been designated a Foreign Terrorist Organization. There is no serious argument that such a child is not "subject to the jurisdiction" of the United States and thus entitled to citizenship by birth.

***Foreign government employees***. The "foreign government employee" exception suffers from the same fundamental problem. This category covers individuals if both their parents are noncitizens and "either parent of that person is a foreign government employee," a category "defined to include" not just "ambassadors," but also "persons employed by a foreign embassy or

consulate who are nationals of that foreign country"; "persons employed by a foreign government in an official capacity"; and "persons employed by an international organization that possess international-organization immunity." 2026 Executive Order § 2(b). Here again, the Order's newly invented category is unmoored from the rationale supporting the circumscribed traditional exception for the children of ambassadors, who are not "subject to the jurisdiction" of the United States because they enjoy diplomatic immunity. *See Barbara*, 146 S. Ct. at 2450.

Other foreign government employees "are subject to the local law in the same manner with other foreign residents owing a temporary allegiance to the state." *Moncada v. Rubio*, 153 F.4th 733, 739 (9th Cir. 2025) (internal quotation marks omitted). *Wong Kim Ark* explicitly notes as much, explaining that—unlike foreign ministers—"consuls, as such unless expressly invested with a diplomatic character in addition to their ordinary powers, are not considered as intrusted with authority to represent their sovereign in his intercourse with foreign states … or entitled by the law of nations to the privileges and immunities of ambassadors or public ministers, but are subject to the jurisdiction, civil and criminal, of the courts of the country in which they reside." *Wong Kim Ark*, 169 U.S. at 678–79. And the "foreign government employee" exception stretches well beyond consuls. It could cover children born to any noncitizen who works at an embassy or international organization, from security guards to janitors, without regard to their duties. Here too, there is simply nothing tethering the President's new exception to the text of the Fourteenth Amendment, text he has no authority to rewrite or overrule.

***Commercial Transaction Category***. Finally, the 2026 Executive Order covers individuals if both their parents are noncitizens and "either parent of that person engaged in a commercial transaction to purchase or access birthright citizenship for the person, or engaged in fraudulent activity to obtain citizenship." 2026 Executive Order § 2(c). This category is, if anything, even

more obviously unconstitutional than the other two. It does not bear so much as a superficial resemblance to any of the traditional exceptions identified in *Wong Kim Ark* and *Barbara*. On the contrary, the status of so-called "birth tourists" was directly at issue in *Barbara*, and the Supreme Court held that their children are citizens.

At the Supreme Court, the Solicitor General argued that interpreting the Fourteenth Amendment as granting citizenship to nearly all children born in the United States, including the children of sojourners, "encouraged 'birth tourists' to travel to the United States solely to acquire citizenship for their children." Brief of Petitioners at 4, *Barbara*, 146 S. Ct. 2438 (No. 25-365). The Government encouraged the Court to adopt its reinterpretation of the Citizenship Clause to prevent the "birth-tourism industry" from "demean[ing] U.S. citizenship by extending it to people who lack any meaningful ties to the country." *Id.* at 9 (internal quotation marks and citations omitted). But the Supreme Court emphatically rejected that argument, explaining that "a sovereign's jurisdiction made no exception for those only temporarily present within the sovereign's territory," *Barbara*, 146 S. Ct. at 2450, "no matter how 'momentary and uncertain' [their] presence," *id.* at 2446 (quoting *Calvin's Case*, 77 Eng. Rep. at 384). And despite their disagreements with the majority, the dissenting Justices in *Barbara* likewise understood that the Court's holding resolved the question. *See id.* at 2524 (Thomas, J., dissenting) (describing the majority as "recognizing a constitutional right to citizenship for the children of all foreign birth tourists and illegal aliens"); *id.* (Alito, J., dissenting) ("As interpreted by the Court today, the Fourteenth Amendment confers citizenship on virtually everyone who happens to be born in this country, including the children of 'birth tourists,' women who come here solely for the purpose of giving birth to a child and then promptly return home.").

It bears underlining, though, the remarkable breadth of this category. It reaches not just those the Administration pejoratively refers to as "birth tourists" but also those who, by way of a commercial transaction, come to the United States hoping to make a permanent home and remain here with their children for the rest of their lives. And with no indication how the Administration plans to judge individuals' intent, any noncitizen who has a child in the United States after paying for transportation to get here faces the risk that their child will be denied citizenship. Meanwhile, the surrogacy prong of the Executive Order applies to parents who use a surrogate in the United States even when the parents themselves are also present in this country.

## II. The Remaining Injunction Factors Decisively Favor Immediate Relief.

If allowed to go into effect, the 2026 Executive Order threatens immediate and irreparable harm to Plaintiffs and countless others like them. Prompt injunctive relief is necessary to prevent that harm and protect the public interest in honoring the Constitution's "promise" of birthright citizenship. *Barbara*, 146 S. Ct. at 2458.

### A. The Executive Order Threatens Irreparable Harm.

It is axiomatic that "[t]he deprivation of a constitutional right, for even minimal periods of time, unquestionably constitutes irreparable injury." *CASA I*, 763 F. Supp. 3d at 744 (internal quotation marks omitted) (quoting *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022)); *see also Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc) ("Because there is a likely constitutional violation, the irreparable harm factor is satisfied."). But the harms of lost citizenship are especially acute. Like the 2025 Executive Order, the 2026 Executive Order unconstitutionally purports to deny class members that "most precious right." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 159 (1963). Its denial "for any period of time" will cause Plaintiffs—and the countless others in the proposed class—irreparable harm that is both "concrete and imminent," *CASA I*, 763 F. Supp. 3d at 744.

Denial of citizenship represents "the total destruction of the individual's status in organized society … a form of punishment more primitive than torture, for it destroys for the individual the political existence that was centuries in the development." *Trop v. Dulles*, 356 U.S. 86, 101 (1958). It leaves class members in a precarious legal status, vulnerable to being "placed in removal proceedings and deported." *CASA I*, 763 F. Supp. 3d at 744. That could lead to the intolerable separation of parents from children. *Id*. And without access to United States citizenship, some class members will be left stateless, with their "very existence" subjected to "the sufferance of the country in which they happen to find themselves." *Id*. (alterations omitted) (quoting *Trop*, 356 U.S. at 101).

**B. Enjoining the Executive Order Would Serve the Public Interest.**

The third and fourth preliminary injunction factors—the balance of the equities and the public interest—likewise "weigh very strongly in the plaintiffs' favor." *CASA I*, 763 F. Supp. 3d at 745. Where the government is a party, those factors merge. *See Miranda*, 34 F.4th at 365 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). It goes without saying that the public interest favors upholding the Constitution and keeping the core promise of the Citizenship Clause. *See Leaders of a Beautiful Struggle*, 2 F.4th at 346 ("[I]t is well-established that the public interest favors protecting constitutional rights."). Defendants, for their part, are "in no way harmed by issuance of a preliminary injunction which prevents [them] from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *CASA I*, 763 F. Supp. 3d at 745 (quoting *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191 (4th Cir. 2013)).

As when the President last attempted to overturn the Nation's traditions, the plain text of the Fourteenth Amendment and 8 U.S.C. § 1401(a), and the clear command of the Supreme Court, the equities favor preserving a status quo that is central to our national identity. The federal

government has recognized the birthright citizenship of members of the proposed class since the Founding; it will not be harmed by continuing to do so pending a final determination of the merits of this case. And injunctive relief is necessary to avoid throwing the lives of countless people into chaos as they and their families grapple with unanswerable questions about their citizenship status. This Court should immediately enter preliminary relief to protect those individuals. And for the same reasons, the Court should not impose a bond.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully urge the Court to grant a preliminary injunction barring enforcement of the 2026 Executive Order against Plaintiffs and the members of the proposed class.

Dated: October 15, 2026

Respectfully submitted,

*/s/ William Powell*

William Powell*
Mary B. McCord (D. Md. 21998)
Rupa Bhattacharyya*
Alexandra Lichtenstein*
Grayson Clary*
INSTITUTE FOR CONSTITUTIONAL ADVOCACY AND PROTECTION
Georgetown Law
600 New Jersey Ave. NW
Washington, D.C. 20001
Phone: (202) 661-6629
Fax: (202) 661-6730
whp25@georgetown.edu
mbm7@georgetown.edu
rb1796@georgetown.edu
arl48@georgetown.edu
gec50@georgetown.edu

Conchita Cruz*
Leidy Perez*
Marcela X. Johnson*
ASYLUM SEEKER ADVOCACY PROJECT
228 Park Ave. S., #84810
New York, NY 10003-1502
(646) 600-9910
conchita.cruz@asaptogether.org
leidy.perez@asaptogether.org
marcela.johnson@asaptogether.org

*Attorneys for Plaintiffs*

* *Application for admission pro hac vice pending or forthcoming*

**CERTIFICATE OF SERVICE**

I hereby certify that, on October 15, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. There is currently no Counsel of Record for Defendant. I certify that I will serve the foregoing on Defendant along with the Complaint.

/s/ *William Powell*
William Powell

*Counsel for Plaintiffs*